AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America, | |
| v. | Case No. 2:26-MJ-01215-DUTY |
| Leo Grillo, | |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT
3/03/26
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ev___ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 3, 2026, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(d) | Attempted Kidnapping |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Robert McElroy
*Complainant's signature*

Robert McElroy, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 3/3/26

*Judge's signature*

City and state: Los Angeles, California

Hon. Margo Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Reidy, x8536

**AFFIDAVIT**

I, Robert McElroy, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Leo GRILLO ("GRILLO"), for a violation of 18 U.S.C. § 1201(d): Attempted Kidnapping.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. INTRODUCTION

3. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2019. I am currently assigned to the Los Angeles Field Division Lancaster Resident Agency, which is responsible for investigating violent crimes, white collar crimes, and crimes against children in the cities that fall within the Lancaster Resident Agency's area of responsibility.

4. Since becoming an FBI SA, I have received formal training at the FBI Training Academy in Quantico, Virginia. This training included segments on conducting criminal

investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to kidnapping, extortion, criminal threats, fugitives, homicide, Hobbs Act robberies, murder-for-hire, and other violent crimes.  I have participated in many aspects of criminal investigations, such as, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

### III. STATEMENT OF PROBABLE CAUSE

**A.  CW1 Reports to the FBI that Grillo Asked CW1 to Organize and Execute a Kidnapping**

5.  On January 31, 2026, I and another FBI agent interviewed Cooperating Witness 1 ("CW1"), who reported a possible kidnapping plot to the FBI.[1]  CW1 related that GRILLO, a former client of CW1's, had sought CW1 out to help kidnap Victim 1, who had sued GRILLO's animal sanctuary and obtained a $6.7 million judgement.

6.  Based on information from CW1, I understand the following:

   a.  In December of 2025, GRILLO had been trying to contact CW1 and had left a voicemail discussing a recent lawsuit that GRILLO had lost and that he believed was unfair.  GRILLO

---

[1] CW1 is the target of a separate FBI investigation into alleged fraud.  CW1 is working with law enforcement in hopes of receiving favorable consideration in connection with that investigation.

2

further stated that he was working on a few different "projects" and wanted CW1 to work with him. CW1 advised that GRILLO was deeply concerned about possible surveillance and often talked in coded language.

  b. CW1 called GRILLO back and GRILLO asked to meet in person. According to CW1, GRILLO did not like to talk about any kind of business over the phone. CW1 agreed to fly from his home in Arizona to meet with GRILLO.

  c. In or around December 2025, CW1 met with GRILLO at the Los Angeles Equestrian Center located in Burbank, California. The two drove separately and upon arrival at the parking lot, CW1 approached GRILLO's vehicle. GRILLO instructed CW1 to write a five-digit number on a piece of paper and that GRILLO would explain the significance of the number later. CW1 kept the piece of paper and later provided it to agents. GRILLO then asked CW1 to leave his cell phone in his vehicle.

  d. The two walked through the horse stables and GRILLO began to discuss his civil lawsuit and how he was going to have to put his charity into bankruptcy. GRILLO felt as though the case was unfair and politically driven. GRILLO told CW1 that he wanted to produce a "documentary" that would target his liability insurance company that GRILLO believed had screwed him over.

  e. GRILLO then asked CW1 to use CW1's contacts in Mexico to find out more about the woman who had sued him. GRILLO then told CW1 that the numbers he asked CW1 to write down upon CW1's arrival were the street number of the address of the

woman who had sued him. GRILLO thought he could approach the woman and convince her to settle the lawsuit against him. GRILLO also thought he could convince the woman who sued him to go after the law firm that had represented the woman in the civil suit. CW1 told GRILLO that there were kiosks in Mexico that CW1 could use to find basic information about the woman and that he also knew a private investigator in Mexico that he could contact. GRILLO told CW1 that he was willing to pay for the information and that was how the first meeting concluded.

      f.  After this first in-person meeting, GRILLO continued to call CW1 to ask for another in-person meeting. The two eventually met for a second time at the same Burbank equestrian center on approximately January 7, 2026. CW1 stated that GRILLO began talking in more "code" than usual during this meeting. GRILLO started talking about a "movie" or "documentary" that he wanted to make.

      g.  GRILLO stated that in this "documentary," he wanted the woman who had sued him to be kidnapped along with her young child and for them to be transported to Mexico and held against their will. While in confinement, the woman would be forced to cooperate with GRILLO regarding her lawsuit. GRILLO said he would be willing to pay $100,000 to make that happen. GRILLO added that he wanted the woman and her child to be flown out of an airport in Lancaster, California. As GRILLO knew, CW1 had business dealings in Mexico, which is why CW1 believed GRILLO had contacted him.

4

   h. GRILLO told CW1 that, once the woman who sued him was held in Mexico, CW1 should do whatever was necessary to make the woman cooperate.  GRILLO was willing to make a down payment of $30,000 or $50,000 to CW1 to effectuate the kidnapping plot.  GRILLO wanted to make it happen before his settlement conference that was scheduled at the time for the end of February or early March 2026.  That concluded the second meeting.

  7. CW1 agreed to work with law enforcement to investigate GRILLO.

  **B. Agents Corroborate Aspects of CW1's Account of GRILLO's Kidnapping Proposal**

  8. Public source internet searches and searches of law enforcement databases corroborated aspects of CW1's account of GRILLO's antagonistic relationship with Victim 1, and other factual matters discussed by GRILLO regarding Victim 1's lawsuit.

  9. Using online resources, I learned that GRILLO is the founder and president of Dedication and Everlasting Love to Animals ("D.E.L.T.A.") Rescue, an animal welfare organization based in Acton, California, in Los Angeles County.  D.E.L.T.A. Rescue bills itself as the largest no-kill animal sanctuary of its kind in the world.

  10. Court records confirm the existence of a lawsuit between GRILLO's animal sanctuary and Victim 1.  I have reviewed court records showing a wrongful termination lawsuit that Victim 1 filed against D.E.L.T.A. Rescue in Los Angeles Superior Court.  Court records from the suit show that, on November 5, 2024,

5

Victim 1 prevailed over D.E.L.T.A. Rescue after a jury trial and was awarded $5,680,950 in compensatory damages and $1,000,000 in punitive damages.

11. Court records also corroborate an early March hearing in the case, just as GRILLO mentioned. According to electronic court records, the next scheduled hearing in Victim 1's lawsuit against D.E.L.T.A. Rescue is set for March 13, 2026.

12. I have also reviewed bankruptcy court filings for <u>In re: Dedication & Everlasting Love to Animals dba D.E.L.T.A. Rescue</u>, Case No. 2:25-bk-13881-NB, (Bankr. C.D. Cal.), indicating that DELTA Rescue filed for Chapter 11 Bankruptcy on May 9, 2025. The bankruptcy filing corroborates GRILLO's statement that he was concerned he would have to put his animal sanctuary into bankruptcy.

13. Using law enforcement databases, I was also able to corroborate that the five-digit number GRILLO provided to CW1 was indeed the street number of Victim 1's residence.

### C. CW1 and GRILLO Meet for a Third Time in Los Angeles, California

14. On February 3, 2026, GRILLO emailed CW1 several news stories related to his lawsuit, including some that mentioned Victim 1's name and had a photograph of her face. I have reviewed the emails that GRILLO sent CW1.

15. GRILLO also called CW1 and asked to meet again in-person. On February 4, 2026, CW1 called GRILLO via Telegram, an encrypted, cloud-based instant messaging service. The call took place at the FBI Phoenix Field Office and was recorded by FBI

agents.  During the call, both CW1 and GRILLO talked in code and ultimately agreed to meet in-person in Los Angeles, California, to further discuss the upcoming "production."

16.  On February 13, 2026, CW1 met with GRILLO at the Burbank equestrian center parking lot.  GRILLO brought a small camper van that he had recently purchased and hinted to CW1 that the camper van was a more secure way to meet.  Instead of walking through the stables, the two sat in the camper van.  The meeting was live-monitored via audio to a nearby FBI surveillance team of which I was a part.  The meeting was also audio and video recorded, however it was later discovered that the technology failed and only the first approximately 30 minutes were actually audio and video recorded.  The live-monitoring, however, was uninterrupted and clear, and agents were able to listen simultaneously to the entire conversation.

17.  Both CW1 and GRILLO talked in code throughout the meeting, which lasted approximately two-and-a-half hours.  GRILLO referred to the "production" and continually asked CW1 about what the plan was to convince Victim 1 to go to Mexico willingly.  GRILLO stated that Victim 1 would be desperate for cash so it would be easy to gain her cooperation to then extort her lawyer.  GRILLO refused to talk to anyone in Mexico directly and would only communicate through CW1.  GRILLO agreed to send CW1 a check for $20,000 to arrange for a pilot and a plane to transport Victim 1 to Mexico.  GRILLO understood that the funds would also go to the cost of holding the woman in Mexico.  A large portion of the conversation was around how to convince

7

Victim 1 to leave her house and go to the airport in Lancaster, California, and how to convince her to get on the plane.

**D. GRILLO Mails a Check for $20,000 to CW1 and Confirms He Wants to Get the Victim on a Plane to Mexico and to Hold Her and Her Husband "Whether They Want to Or Not"**

18. On February 19, 2026, CW1 received a United States Postal Service package from GRILLO. The package showed the sender as "Leo Grillo." Inside, it contained a USB drive and a check[2] from "Animals Are People Too," for $20,000.[3] The memo on the check stated "Production," consistent with GRILLO's coded terminology for the plot to kidnap Victim 1 and her husband.

19. Agents from the United States Postal Inspection Service ("USPIS") obtained data related to the package with the $20,000 that was sent to CW1.

    a. The package was processed for mailing at the USPS branch in Acton, California. I know from review of D.E.L.T.A. Rescue's bankruptcy filing that its address is also located in Acton, California.

    b. The USPS account used to pay for the package with the check is associated with an email address,

---

[2] On February 27, 2026, the Honorable Pedro V. Castillo, U.S. Magistrate Judge, authorized a cell-site location warrant for phone numbers associated with CW1 and GRILLO. See Case No. 26-MJ-1105 (Sealed). In an earlier affidavit for that warrant, another agent described this as a cashier's check. That was in error, as the check appears to be a check written from an account associated with Animals Are People Too.

[3] Based on information available from the Nevada Secretary of State, Animals Are People Too was established as a Domestic Nonprofit Corporation in March of 2006. GRILLO is named as the president. Because Animals Are People Too is registered as non-profit, I was able to review its tax returns for 2024 on a publicly available website. GRILLO is named as the president on those returns.

Ericagrillo@earthlink.net.  I know from review of D.E.L.T.A. Rescue's bankruptcy filing that Erica Grillo signed the bankruptcy petition and identified herself as the nonprofit's secretary.

20.  On February 24, 2026, CW1 called GRILLO via Telegram in front of FBI Agents at the FBI Phoenix Field Office.  The phone call was recorded.

21.  CW1 initially called GRILLO on Telegram and said that "someone" was trying to call GRILLO on Telegram.  CW1 was provided a separate cellphone, or "burner" from the FBI, and had sent a GRILLO a request on Telegram using the number on the burner device.[4]  CW1 told GRILLO he should accept the request, and that GRILLO will understand the purpose of the call shortly.  GRILLO agreed.

22.  Shortly after, CW1 used the second phone to call GRILLO on Telegram and GRILLO answered.  During this call CW1 told GRILLO that he wanted to speak on a "clean line" just because things were moving quickly.  CW1 explained that he wanted to make sure that they were on the same page and that, "they can get her and the husband to the airport willingly and at that point they are going whether they want to or not.  That flight's taking off for a remote part of Mexico and they will be put into housing there that we discussed . . . and that could happen like any day."  GRILLO asked: "This phone is burnt?"  I understood GRILLO to be asking whether the phone was a burner

---

[4] FBI Agents in Phoenix procured this second cell phone to call GRILLO in an attempt to put GRILLO at ease over discussing business over the phone.

9

phone, a prepaid anonymous phone designed for temporary use and disposal to protect privacy and avoid tracking. CW1 replied yes and assured him that he would get rid of the sim card after the conversation. CW1 continued: "that's the way they are doing it and. . . the check is here . . . the check has arrived . . . we are on the same page." After GRILLO asked more questions about the security of the phone line, GRILLO responded, "Alrighty, we are good."

23. Almost immediately after CW1 hung up, GRILLO called back on the burner device and asked CW1, "Why did we need that call?" CW1 explained that he needed to make sure they were on the same page. GRILLO replied that "the problem with that is that if anyone picked that up it puts me right in the middle of it."

### E. GRILLO Re-Confirms Desire to Move Forward with Kidnapping in Recorded Meeting with CW1

24. On March 3, 2026, shortly after 8:00 a.m., CW1 made a recorded phone call to GRILLO. CW1 asked GRILLO if he could meet at "the racetrack," referring to the Burbank equestrian center where their previous kidnapping-related meetings had taken place. CW1 did not provide any detail about why the in-person meeting had to happen, only that it was urgent. GRILLO said he would meet with CW1 around 11 a.m. that day.

25. Before the meeting, agents outfitted CW1 with audiovisual recording equipment that recorded CW1's interaction with GRILLO and also allowed me and several other agents to listen in on the interaction as it transpired. After the

meeting, agents discovered that the audio recording was successful but the video recording equipment had not worked.

26.  Around 11:05 a.m., CW1 arrived at the Burbank equestrian center where GRILLO was waiting for him in his camper van.  CW1 told GRILLO that he needed to speak to him about "the stuff in Mexico."  CW1 told GRILLO that "they've got 'em" and showed GRILLO a fake photograph on CW1's phone showing what appeared to be Victim 1 and an adult male tied up with zip ties.  Victim 1 also had duct tape over her mouth.  A redacted copy of the fake photograph is provided below.



27.  Before showing GRILLO the photograph, CW1 said that he was going to delete the photograph and did not want it on his phone.  CW1 said that all had gone according to plan--Victim 1 and her husband "went willingly to the airport and then they did not go willingly."  CW1 also said that Victim 1 and her family were in custody.

11

28. But the plan had hit a snag. CW1 told GRILLO that the kidnappers could not take Victim 1 and her husband to the place they had originally intended to take them in Mexico. CW1 said that they needed to take Victim 1 and her family to a different place.

29. CW1 said that the kidnappers needed a new flight plan. CW1 said that Victim 1 and her husband were still in Lancaster. GRILLO responded, "they haven't left Lancaster? Oh my God. They're holding them in Lancaster? . . . Their sons are in their twenties, they can call Sheriff."

30. CW1 told GRILLO that the kidnappers needed "another ten grand." GRILLO responded, "okay. I brought a check. I'm gonna give you twenty and then you just tell them you only got ten. So you get a contingency just in case." CW1 responded that $10,000 would be fine.

31. GRILLO then followed up, "What are they doing after that, now? They're taking--They're going--Are they still able to go to Mexico?" CW1 responded that the place they originally intended to go to in Mexico no longer worked and they needed a new spot.

32. GRILLO talked to CW1 about the effect of Victim 1's kidnapping on her pending lawsuit. GRILLO stated that, if the appeal of the verdict were successful and the case were to be re-tried, "there's no plaintiff! . . . I'm her, I'm not showing up for the retrial."

33. GRILLO also mused about what he would say, "if I ever get busted on this by the Feds."

34. GRILLO then asked CW1 what code CW1 would use to let GRILLO know that the kidnapping had gone according to plan. GRILLO said, "just give me a sentence . . . a metaphor . . . something to do with a horse." CW1 said that, if CW1 said something complimentary toward a horse, and GRILLO finished CW1's sentence for him: "that means it's going as planned, everything is going well." And CW1 agreed.

35. GRILLO then asked CW1, "who do I make this out to?" GRILLO was referring to the check he was going to write to the kidnappers. GRILLO then wrote CW1 a check for $10,000 and gave it to CW1 who later provided it to FBI agents (redacted version below).



36. GRILLO told CW1 that, "I've got a lot of smokescreens," to conceal the kidnapping plot, including "the movie, make a documentary about this whole thing."

37. GRILLO also wondered aloud, "How the fuck are they gonna get out of Lancaster?" GRILLO then confirmed that Victim 1 and her husband were taken: "Was he there too? Her husband?" CW1 responded that Victim 1 and the husband were in the (fake) photograph that he had previously shown to GRILLO.

38. On March 2, 2026, the Honorable Maria A. Audero, U.S. Magistrate Judge, signed a search warrant for GRILLO's person to look for evidence of attempted kidnapping in case number 2:26-mj-1134. Agents executed the warrant for GRILLO's person at the conclusion of his meeting with CW1.

39. During the search, agents recovered two firearms, one on either side of GRILLO's person. Agents also recovered two digital devices.

### F. Agents Conduct a Post-Arrest <u>Mirandized</u> Interview of GRILLO

40. After receiving <u>Miranda</u> warnings, GRILLO agreed to speak with FBI agents.

41. During the interview, GRILLO was shown the fabricated kidnapping photograph that CW1 had shown him during their meeting earlier that day. When asked about the photo, GRILLO identified the person in the photo as Victim 1 and discussed her lawsuit against D.E.L.T.A. Rescue. GRILLO acknowledged that, if the lawsuit was retried and Victim 1 was unable to testify, that would be a favorable development for D.E.L.T.A. Rescue.

42. GRILLO also repeatedly insisted that he had paid CW1 for his participation in a documentary unrelated to Victim 1, and not a kidnapping.

## IV. CONCLUSION

43. For all the reasons described above, there is probable cause to believe that GRILLO has committed a violation of 18 U.S.C. § 1201(d): Attempted Kidnapping.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  3rd day of
March, 2026.

_____
HON. MARGO ROCCONI
UNITED STATES MAGISTRATE JUDGE

15